1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   WILLIAM ESTES,                              No.  2:14-cv-2192-KJM-EFB P

12                   Petitioner,

13            vs.

14   SCOTT FRAUENHEIM,                           FINDINGS AND RECOMMENDATIONS

15                   Respondent.

16

17          Petitioner is a state prisoner proceeding without counsel with a petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges a judgment of conviction entered

19   against him on February 3, 2011, in the Sacramento County Superior Court on charges of rape,

20   assault with a deadly weapon, false imprisonment, and committing a lewd or lascivious act upon a

21   child under the age of 14, with jury findings that petitioner personally inflicted great bodily

22   injury, used a deadly or dangerous weapon, committed a sexual offense against two or more

23   victims, and had a prior serious felony conviction.  Petitioner seeks federal habeas relief on the

24   following alleged grounds: (1) the trial court violated his right to due process in admitting

25   evidence of his prior conviction for unlawful sexual intercourse with a minor; (2) his trial counsel

26   rendered ineffective assistance; (3) the trial court violated his right to due process in denying his

27   motion to sever the trial on the counts against each victim; and (4) the cumulative effect of errors

28   at his trial violated his right to due process.  Upon careful consideration of the record and the

                                               1

applicable law, the undersigned recommends that petitioner's application for habeas corpus relief be denied.

## I. Background

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> A jury convicted defendant William Estes of rape, assault with a deadly weapon, false imprisonment, and committing a lewd or lascivious act upon a child under the age of 14, finding true the allegations that defendant personally inflicted great bodily injury, used a deadly or dangerous weapon, and committed a sexual offense against two or more victims.  The trial court found that defendant had a prior serious felony conviction and sentenced defendant to 340 years to life in state prison.

> Defendant now contends (1) the trial court abused its discretion in admitting evidence, pursuant to Evidence Code section 1108, of a prior sexual offense,[1] (2) defense counsel was ineffective in failing to object to testimony regarding an uncharged act, (3) the trial court erred in denying defendant's motion to sever trial of the counts involving different victims, and (4) cumulative error requires reversal.

> Defendant's contentions lack merit. We will affirm the judgment.

> **BACKGROUND**

> **A**

> T.W. shared an apartment with her friend Robert in January 2009.[2] She met defendant in the computer center at her apartment complex.  Defendant gave her his phone number and T.W. texted him.

> T.W. saw defendant at the computer center again the next day.  She had been fired from her job and defendant gave her a hug.  He was "flirty" and "very touchy."  T.W. told defendant she was "interested in somebody else," her friend Joshua.

> The next morning, defendant offered to help T.W. look for a job. They drove around looking for places that were hiring.  That night, T.W. ate pizza with Robert, Joshua, defendant and defendant's girlfriend Jennifer.  T.W., Robert and Joshua left after 45 minutes.

---

[1]   Undesignated statutory references are to the Evidence Code.

[2]   Because some of the witnesses have the same last name, we will refer to the lay witnesses by their first names for clarity.

2

Defendant texted T.W. that he was upset they left so abruptly. T.W. invited defendant over and apologized.

The next day, defendant sent T.W. numerous text messages but she did not respond.  Around 9:30 p.m., he texted T.W. that he wanted her to meet his mom, who worked at Comcast, to discuss the hiring process.   T.W. was starting to get "really creeped out" by defendant, but eventually agreed to meet him because she needed a job.  Before she left, Robert set up T.W.'s phone so that all she had to do was push "send" to call him.  T.W. took a pocket knife with her.

Meanwhile, defendant told Jennifer that T.W. needed a ride to the store to buy cheese.  Defendant picked up T.W. wearing jeans, a green wind breaker and black gloves.  They drove a short distance to defendant's old apartment because defendant said he needed something there.  Defendant had a "Finding Nemo" key to the apartment and a 15– to 18–inch Maglite flashlight.  The lights were off and defendant used the flashlight to illuminate the apartment.

Defendant asked T.W. to look in several places for a bag, but she did not find it.  Defendant gestured for her to go ahead of him through the master bedroom door; as she did so, he hit her from behind on the left side of her face with a hard object.  Defendant screamed about T.W. being rude on the night they ate pizza.  He began ripping off her clothes and fondling her breasts.  She blacked out.  When she woke up on the floor, she struggled to get away, but defendant hit her and she blacked out again.

The next time T.W. woke up she was lying on her stomach with defendant on top of her.  She saw a puddle of blood. T.W.'s hands were tied behind her back, there was a rope around her neck, and she was terrified she was going to die.  The rope around her neck was affecting her ability to breathe, so defendant used a kitchen knife to cut the rope.  Defendant buttoned up his pants and said he had to "clean up and get rid of the condom."  When he came back, he still had the knife.

T.W. suggested they make up a story so defendant would not get in trouble.  Defendant thought they could concoct a story about getting mugged.  He told T.W. "[she] was dead" if she did not go along with the plan.   Fearing for her survival, T.W. falsely assured defendant she would "go along with anything he wanted."  He described a plan involving a black male mugger, and wanted T.W. to say that defendant had a seizure, which would explain why he did not have any injuries.

Defendant helped T.W. up.  She was very dizzy and could not walk very well.  Defendant said he had a gun.  He called Jennifer and informed her they were at their old apartment and they had been mugged.  Defendant also called 911 and told the operator he and his "best friend" T.W. had been mugged and were hurt.  He claimed not to know where they were and said to trace the call.

3

Defendant tried to "weave" his hands behind T.W. so it would look like he was also tied up. He said he would fake a seizure and she would need to "start talking."

Jennifer showed up and untied T.W. and defendant. Jennifer noticed the string was like the string she and defendant used when they moved from their old apartment.

Robert called, and T.W. "freaked out on him," crying so much he could barely understand her. T.W. subsequently apologized to Jennifer, pulled out her pocketknife and began stabbing defendant, yelling, "He raped me, he raped me." Officer Ethan Hanson arrived and pulled T.W. off of defendant. She was crying uncontrollably.

T.W. was transported to UC Davis Medical Center. She had fractures along her nose, under her left eye and on her left cheek, requiring facial surgery. She also had a broken sternum, a black eye, a concussion, chipped teeth, and red marks around her wrists and neck. T.W. described the assault to the physician assistant and nurse practitioner performing the sexual assault exam. The physician assistant opined that T.W.'s injuries were consistent with her description.

Defendant told Officer Hanson they had been at the apartment getting a futon for a friend. He said they were assaulted by an unknown assailant. Defendant was taken to the hospital to treat two puncture wounds in his chest. Officer Hanson found nylon kite string outside the apartment.

Officer Wesley Nezik interviewed defendant in the emergency room at the hospital. Defendant said he had been taking T.W. to the store to buy cheese, and they stopped at his old apartment because T.W. wanted his old futon. The door to the apartment was unlocked, and when he went inside he felt "something push him." He fell to the ground, thought he saw a black male on top of T.W., and did not remember anything after that. He denied knowing why T.W. stabbed him, and denied having sex with her. Defendant claimed not to know anything about a condom wrapper found in the apartment.

CSI Officer Janelle Gurnee processed the crime scene. She found blood on the carpet and walls in one of the bedrooms, a carving knife with blood on it, a Maglite, a torn condom wrapper, and a blue "Finding Nemo" key with an orange fish on it. Officer Gurnee also found string similar to the string found by Officer Hanson. The blood samples taken from the wall, carpet, knife and Maglite matched T.W.'s DNA profile. The condom wrapper was tested and the major contributor matched T.W.'s profile, and the minor contributor was consistent with defendant's profile. In addition, carpet samples from the bedroom had "visualized sperm" that matched defendant's DNA profile.

Jennifer testified that after she and defendant moved to their new apartment, she kept a "Finding Nemo" key to their old apartment. Defendant noticed the key prior to the assault and asked why she

4

still had it.  She said she kept it because she liked it.

Defendant gave Officers Buchanan and Hanson accounts similar to the one he gave Officer Nezik.  He denied using a key to open the door, denied having a "Finding Nemo" key for the apartment, denied using condoms, and denied assaulting or raping T.W.

Detective Brian McDougle extracted call logs and text messages from T.W.'s cell phone and found no messages from T.W. asking defendant to take her to the store for cheese.  He found an exchange where defendant indicated to T.W. that he would rather be in her company than with his "friend" Jennifer, and T.W. responded in a noncommittal manner, causing defendant to text, "You don't really like being with me, do you, honest?"  Subsequently, T.W. texted that she liked defendant "as a friend, and that's it."  She advised defendant that she and Josh had "something going on."  Defendant asked to see her outside, and when she questioned why, he said he wanted to take her to pick up a job application from his mother's house.  T.W. responded, "Okay.  Just give me ten minutes and I'll be over there or come get me."  There were three calls from T.W. to defendant, and 27 calls from defendant to T.W.

**B**

Jennifer's brother Eric had a friend named B.L.  B.L. met defendant at the home of Eric's parents.  Detective Andrew Newby became aware of B.L. while investigating the assault on T.W.

On December 30, 2008, when B.L. was 13, she received a text from Eric's phone that said, "Do you want to hang out?"  She replied that she did.  She received a text saying that she should go to the park and defendant would pick her up.  When defendant arrived at the park, B.L. was surprised to see that Eric was not with him.  But she agreed to go with defendant because she thought he was taking her to Eric.

Defendant said he had to run some errands. He took B.L. to In–N–Out Burger, where she saw him talk with a blond girl who was "on the heavy side."  After talking to the girl for awhile, defendant got back in the car and drove to Papa John's pizza restaurant.

Defendant claimed they were there to pick up Eric from a job interview.  He told B.L. to get in the backseat so that Eric could sit in front.  When she complied, however, defendant got into the back also.  He pulled out a knife, placed it against her neck, and told her to take off her clothes or he would kill her.  B.L. removed her pants and underwear, and defendant "started to . . . rub his penis around [her] vagina," asking her, "Do you like my big dick?"  B.L. screamed "no" and "stop," but defendant put his penis in "a little bit," at which point she felt a sharp pain.  She screamed at defendant to get off, but he kept "trying to push it in."  Eventually defendant said, "I feel stupid," and told her that her boyfriend was "going to do this to [her]."

5

Defendant and B.L. got in the front seat.  He threatened to kill her if she told anyone.  Defendant dropped her back at the park.  She did not call the police, and continued to respond to texts from defendant after that day, because she was afraid.

About two days later, defendant used Eric's cell phone and sent a text to B.L. asking her to come over to defendant's apartment, where Eric was staying.  B.L. and Eric had been fighting and she wanted to make up with him.  She assumed defendant would not do anything to her with Eric there.  B.L. had not informed Eric about what defendant did to her.

At the apartment, the three played board games and listened to music.  But B.L. and Eric had a disagreement during the game and stopped talking.  Defendant asked B.L. to go into the bedroom so defendant could talk to Eric about the argument.  Defendant appeared to be helping them, so B.L. complied.  While B.L. was in the bedroom, defendant told Eric to go to the gym and wait there while defendant tried to calm B.L. down.  Eric left.

B.L. heard Eric leave.  Defendant came into the room and tried to hand her a condom, but she told him she did not want it.  Defendant pulled out a knife, held it to B.L.'s throat and ordered her to take off her clothes.  She complied.  Defendant began "playing with [her] boobs and sucking on them."  He opened the condom, put it on, and inserted his penis into B.L.  Again, he said he felt stupid and stopped.  He told her to get dressed and warned her not to tell anyone or he would kill her.

Defendant called Eric and said B.L. was calmed down.  When Eric returned, B.L. was on the couch and seemed "upset and scared."  Although Eric told a defense investigator that he never went to the gym and that B.L. seemed fine, that was because his sister Jennifer was still seeing defendant and Eric did not want to hurt her.

When Jennifer arrived home from work, she found defendant, Eric and B.L. cleaning the apartment.  The sheets were not on the bed and defendant said he was doing laundry.  She saw a purple condom wrapper on the floor of the bedroom.

About seven to 10 days later, B.L. met Eric at his parents' house and appeared "terrified."  B.L. told him that she was putting her life on the line by telling him and that defendant would come after her, but defendant had raped her while Eric was at the gym.

A law enforcement review of B.L.'s phone records revealed that she began receiving text messages from defendant on December 30, 2008, and they exchanged approximately 600 messages in the next few days.  Defendant initiated around two-thirds of the messages.  Phone records led law enforcement to Victoria, the heavier blonde woman B.L. described.

Victoria knew defendant and Jennifer.  They discussed becoming roommates, and one conversation with defendant occurred at In–N–

Out Burger. At the time, Victoria saw someone in the back of defendant's car.

Victoria's father persuaded her not to move in with defendant and Jennifer. When she informed defendant she was not moving in, defendant pulled out a knife. Victoria was "surprised," but it was "not . . . a threatening knife" so she took it out of his hands and threw it. She left in her car and called Jennifer to tell her what happened. Jennifer said she would take care of it and asked Victoria not to call the police. When Jennifer returned home from work, she found blood on the wall and a bloody knife. Defendant had a cut on his arm and finger.

Detective Newby obtained recordings of phone calls defendant made while he was in jail. Defendant told Jennifer there was a knife under the mattress and to put it back in the kitchen. He also told Jennifer to get rid of his cell phone. She complied because she was afraid of him.

The jury convicted defendant of the following: rape of T.W. (Pen. Code, § 261, subd. (a)(2) - count one), finding true the allegations that defendant personally inflicted great bodily injury (Pen. Code, §§ 667.61, former subd. (e)(3), 12022.8), personally used a deadly or dangerous weapon (a flashlight) (Pen.Code, §§ 667.61, former subd. (e)(4), now subd. (e)(3), 12022.3, subd. (a)), and committed a sexual offense against two or more victims (Pen. Code, § 667.61, former subd. (e)(5), now subd. (e)(4)); assaulting T.W. with a deadly weapon (a flashlight) (Pen. Code, § 245, subd. (a)(1) - count two), finding true the allegation that defendant personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)); false imprisonment of T.W. (Pen. Code, § 236 - count three); committing a lewd or lascivious act upon a child under the age of 14 (B.L.) (Pen. Code, § 288, subd. (a) - counts four through eight), finding true the allegations that he used a deadly weapon (a knife) (Pen.Code, § 667.61, former subd. (e)(4), now subd. (e)(3), 12022.3, subd. (a)) and committed a sexual offense against two or more victims (Pen. Code, § 667.61, former subd. (e)(5), now subd. (e)(4)).

The trial court found that defendant had a prior serious felony conviction and sentenced him to 340 years to life in state prison.

*People v. Estes*, No. C067917, 2013 WL 4477449 at **1-5 (Cal. 3 Dist. Aug. 20, 2013).

After the California Court of Appeal affirmed petitioner's judgment of conviction, he filed a petition for review in the California Supreme Court. Resp't's Lodg. Doc. 5. That petition was summarily denied. Resp't's Lodg. Doc. 6.

## II. Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28

7

1  U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

2  application of state law.  *See Wilson v. Corcoran*, 562 U.S. 1,5 (2010); *Estelle v. McGuire*, 502

3  U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

4        Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

5  corpus relief:

6        An application for a writ of habeas corpus on behalf of a
       person in custody pursuant to the judgment of a State court shall not
7        be granted with respect to any claim that was adjudicated on the
       merits in State court proceedings unless the adjudication of the
8        claim -

9        (1) resulted in a decision that was contrary to, or involved
       an unreasonable application of, clearly established Federal law, as
10       determined by the Supreme Court of the United States; or

11       (2) resulted in a decision that was based on an unreasonable
       determination of the facts in light of the evidence presented in the
12       State court proceeding.

13       For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

14  holdings of the United States Supreme Court at the time of the last reasoned state court decision.

15  *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, ___ U.S.

16  ___, 132 S.Ct. 38 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v.*

17  *Taylor*, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining

18  what law is clearly established and whether a state court applied that law unreasonably." *Stanley*,

19  633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit

20  precedent may not be "used to refine or sharpen a general principle of Supreme Court

21  jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall*

22  *v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155

23  (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so

24  widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court,

25  be accepted as correct. *Id.*  Further, where courts of appeals have diverged in their treatment of

26  an issue, it cannot be said that there is "clearly established Federal law" governing that issue.

27  *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

28  /////

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[3] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 412. *See also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

/////

---

[3]   Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

1  § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

2  considering de novo the constitutional issues raised.").

3       The court looks to the last reasoned state court decision as the basis for the state court

4  judgment.  *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).  If

5  the last reasoned state court decision adopts or substantially incorporates the reasoning from a

6  previous state court decision, this court may consider both decisions to ascertain the reasoning of

7  the last decision.  *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When

8  a federal claim has been presented to a state court and the state court has denied relief, it may be

9  presumed that the state court adjudicated the claim on the merits in the absence of any indication

10  or state-law procedural principles to the contrary."  *Richter*, 562 U.S. at 99.  This presumption

11  may be overcome by a showing "there is reason to think some other explanation for the state

12  court's decision is more likely."  *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

13  Similarly, when a state court decision on a petitioner's claims rejects some claims but does not

14  expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

15  the federal claim was adjudicated on the merits.  *Johnson v. Williams*, ___ U.S. ___, ___, 133

16  S.Ct. 1088, 1091 (2013).

17       Where the state court reaches a decision on the merits but provides no reasoning to

18  support its conclusion, a federal habeas court independently reviews the record to determine

19  whether habeas corpus relief is available under § 2254(d).  *Stanley*, 633 F.3d at 860; *Himes v.*

20  *Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

21  review of the constitutional issue, but rather, the only method by which we can determine whether

22  a silent state court decision is objectively unreasonable."  *Himes*, 336 F.3d at 853.  Where no

23  reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

24  reasonable basis for the state court to deny relief."  *Richter*, 562 U.S. at 98.

25       A summary denial is presumed to be a denial on the merits of the petitioner's claims.

26  *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012).  While the federal court cannot analyze

27  just what the state court did when it issued a summary denial, the federal court must review the

28  state court record to determine whether there was any "reasonable basis for the state court to deny

1  relief." *Richter*, 562 U.S. at 98.  This court "must determine what arguments or theories ... could

2  have supported, the state court's decision; and then it must ask whether it is possible fairminded

3  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

4  decision of [the Supreme] Court." *Id.* at 102.  The petitioner bears "the burden to demonstrate

5  that 'there was no reasonable basis for the state court to deny relief.'"  *Walker v. Martel*, 709 F.3d

6  925, 939 (9th Cir. 2013) (quoting *Richter*, 562 U.S. at 98).

7       When it is clear, however, that a state court has not reached the merits of a petitioner's

8  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

9  habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462

10  F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

11  **III.  Petitioner's Claims**

12       **A.  Erroneous Admission of Evidence**

13       In his first ground for relief, petitioner claims that the trial court violated his right to due

14  process in allowing the prosecutor to present "highly prejudicial" evidence of his prior conviction

15  for unlawful sexual intercourse with a minor.  ECF No. 1 at 6.[4]

16       The California Court of Appeal denied this claim, reasoning as follows:

17
18       Defendant contends the trial court abused its discretion in admitting evidence, pursuant to section 1108, of a prior sexual offense.  He also claims admission of the evidence violated due process.

19
20
21
22
23
24
25       Section 1108 permits "'"consideration of . . . other sexual offenses as evidence of the defendant's disposition to commit such crimes, and for its bearing on the probability or improbability that the defendant has been falsely or mistakenly accused of such an offense."'"  (*People v. Soto* (1998) 64 Cal.App.4th 966, 984.)  Over defendant's objection, the trial court ruled the prosecutor could introduce evidence of defendant's 2005 felony conviction for unlawful sexual intercourse with a minor.  The parties then stipulated that the jury would be told the following: "On April the 22nd of 2005, the defendant, William Estes, was convicted of a felony conviction of Penal Code [s]ection 261.5, unlawful sexual intercourse with a minor."  That was the full extent of the other crime evidence presented to the jury.

26
27
     [4]  Page number citations such as this one are to the page numbers reflected on the court's
28  CM/ECF system and not to page numbers assigned by the parties.

1

2

3

4

Regarding defendant's due process contention, the California Supreme Court rejected such a challenge to section 1108. (*People v. Falsetta* (1999) 21 Cal.4th 903, 916–922 (*Falsetta*); *People v. Loy* (2011) 52 Cal.4th 46, 60–61 (Loy ) [declining to reconsider *Falsetta*].)  We are bound by those decisions. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

5

6

7

8

9

10

11

12

13

As the California Supreme Court explained in *Falsetta*, the trial court's discretion to exclude evidence under section 352 saves section 1108 from a due process challenge. (*Falsetta, supra*, 21 Cal.4th at 917.)  Thus, we turn to defendant's contention that the trial court abused its discretion under section 352.  In considering whether to admit evidence of a prior sex offense, "trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta, supra*, 21 Cal.4th at p. 917.)  The trial court's ruling under sections 352 and 1108 is subject to review for abuse of discretion. (*Loy, supra*, 52 Cal.4th at p. 61; *People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

14

15

16

17

18

19

20

Section 1108 affects the balancing performed under section 352 because the admission of evidence of other sexual offenses to show character or disposition is no longer treated as intrinsically prejudicial or impermissible. (*People v. Soto, supra*, 64 Cal.App.4th at p. 984.)  The Legislature has determined that in sex cases, this evidence is particularly and uniquely probative. (*Loy, supra*, 52 Cal.4th at pp. 61, 63.)  The presumption is in favor of admission; it cannot be excluded under section 352 unless its probative value concerning the defendant's disposition to commit the charged sexual offense is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice. (*Id.* at p. 62.)

21

22

23

24

25

26

27

Here, because defendant was convicted of the prior sexual offense, there was little risk the jury would convict him in this case merely to punish him for the prior act.  Moreover, because his commission of the prior offense was already established, he bore no new burden of defending against the charge and there was little danger of confusing the issues or requiring a mini-trial to determine defendant's guilt in connection with the previous crime. (*Loy, supra*, 52 Cal.4th at p. 61.)  The date of the prior offense was not remote, and no inflammatory details were provided about the underlying facts.  Indeed, the evidence was presented in a brief stipulation setting forth only the date of conviction and the specific offense.  Under the circumstances, the trial court did not abuse its discretion in admitting the evidence. (*Id.* at p. 62.)

28

*Estes*, 2013 WL 4477449, at *5-6.

1    As explained above, a federal writ of habeas corpus is not available for alleged error in the

2  interpretation or application of state law. *Wilson*, 131 S. Ct. at 16. Absent some federal

3  constitutional violation, a violation of state law does not provide a basis for habeas relief. *Id.*

4  Accordingly, the question whether evidence of petitioner's prior conviction was properly

5  admitted under California law is not cognizable in this federal habeas corpus proceeding.

6  *McGuire*, 502 U.S. at 67. The only question before this court is whether the state trial court

7  committed an error that rendered the trial so arbitrary and fundamentally unfair that it violated

8  federal due process. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009); *Jammal v. Van*

9  *de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991) ("The issue for us, always, is whether the state

10  proceedings satisfied due process; the presence or absence of a state law violation is largely

11  beside the point.").

12    A writ of habeas corpus will be granted for an erroneous admission of evidence "only

13  where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system

14  will not be competent to uncover, recognize, and take due account of its shortcomings.'"

15  *Mancuso v. Olivarez*, 292 F.3d 939, 956 (9th Cir. 2002) (quoting *Barefoot v. Estelle*, 463 U.S.

16  880, 899 (1983)), *overruled on other grounds* by *Slack v. McDaniel*, 529 U.S. 473 (2000).

17  Admission of evidence violates due process only if "there are no permissible inferences the jury

18  may draw from the evidence." *Jammal*, 926 F.2d at 920. "Even then, the evidence must 'be of

19  such quality as necessarily prevents a fair trial.'" *Id.* (quoting *Kealohapauole v. Shimoda*, 800

20  F.2d 1463 (9th Cir. 1986)).

21    Moreover, as the Ninth Circuit has observed:

22     The Supreme Court has made very few rulings regarding the
       admission of evidence as a violation of due process. Although the
23     Court has been clear that a writ should be issued when
       constitutional errors have rendered the trial fundamentally unfair
24     (citation omitted), it has not yet made a clear ruling that admission
       of irrelevant or overtly prejudicial evidence constitutes a due
25     process violation sufficient to warrant issuance of the writ.

26  *Holley*, 568 F.3d at 1101 ("[U]nder AEDPA, even the clearly erroneous admission of evidence

27  that renders a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if

28  not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court.")

1     Applying these legal principles here, the state appellate court's rejection of petitioner's

2  due process claim based on the alleged erroneous admission of evidence does not support his

3  request for federal habeas relief under AEDPA because the admission of evidence regarding his

4  prior sexual offense did not violate clearly established federal law.  *Id.*  The United States

5  Supreme Court "has never expressly held that it violates due process to admit other crimes

6  evidence for the purpose of showing conduct in conformity therewith, or that it violates due

7  process to admit other crimes evidence for other purposes without an instruction limiting the

8  jury's consideration of the evidence to such purposes." *Garceau v. Woodford*, 275 F.3d 769, 774

9  (9th Cir. 2001), *overruled on other grounds* by *Woodford v. Garceau*, 538 U.S. 202 (2003).

10  Rather, the Supreme Court has expressly left open this question.  *See Mcguire*, 502 U.S. at 75 n.5

11  ("Because we need not reach the issue, we express no opinion on whether a state law would

12  violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show

13  propensity to commit a charged crime"); *see also Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir.

14  2008) (holding that state court had not acted objectively unreasonably in determining that the

15  propensity evidence introduced against the defendant did not violate his right to due process);

16  *Alberni v. McDaniel*, 458 F.3d 860, 863-67 (9th Cir. 2006) (denying a petitioner's claim that the

17  introduction of propensity evidence violated his due process rights under the Fourteenth

18  Amendment because "the right [petitioner] asserts has not been clearly established by the

19  Supreme Court, as required by AEDPA"); *United States v. LeMay*, 260 F.3d 1018 (9th Cir. 2001)

20  (Fed. R. Evid. 414, permitting admission of evidence of similar crimes in child molestation cases,

21  under which the test for balancing probative value and prejudicial effect remains applicable, does

22  not violate the due process clause).

23     Further, in this case any error in admitting the challenged testimony did not have "a

24  substantial and injurious effect or influence in determining the jury's verdict." *Brecht v.*

25  *Abrahamson*, 507 U.S. 619, 637 (1993).  *See also Penry v. Johnson*, 532 U.S. 782, 793-96

26  (2001).  As explained by the California Court of Appeal, the evidence of petitioner's prior

27  conviction was presented in a stipulation setting forth only the date of conviction and the specific

28  offense.  As noted by the trial judge, the prior conviction was admissible because the offense was

14

1  not remote in time, would not involve an undue consumption of time, and was "not nearly as

2  inflammatory" as the current charges.  The trial judge explained:

3       In considering the nature of the inflammatory nature of the prior
        charges, it is not nearly as inflammatory, I don't believe, especially
4       when it's being proved to use documentary evidence as a statutory
        rape as opposed to the charges in the current case which involve
5       striking a victim allegedly and then raping her in an apartment and
        then with an underaged girl, raping her in the back seat of a car . . .
6

7  Reporter's Transcript on Appeal (RT) at 26.

8       Further, the trial court instructed the jury that petitioner was presumed innocent, and that

9  "the People had the burden of proving him guilty beyond a reasonable doubt."  Clerk's Transcript

10  on Appeal (CT) at 169, 215.  The jurors were also instructed that if they found petitioner suffered

11  the prior conviction they could, but were not required to, infer that he was "disposed or inclined

12  to commit sexual offenses."  *Id.*  The jury was further instructed that if they concluded that

13  petitioner committed the prior acts, that conclusion was "only one factor to consider" and was

14  "not sufficient by itself to prove that [petitioner] is guilty of [the crimes charged]," but that the

15  prosecution must still "prove each charge beyond a reasonable doubt."  *Id.* at 237.  The jury is

16  presumed to have followed these instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000);

17  *Brown v. Ornoski*, 503 F.3d 1006, 1018 (9th Cir. 2007).  Finally, in light of the significant and

18  substantial evidence of petitioner's guilt introduced at his trial, as described in the opinion of the

19  California Court of Appeal, the challenged testimony would not have had a "substantial and

20  injurious effect" on the verdict in this case.  *See Brecht*, 507 U.S. at 623.]

21       The admission of petitioner's prior conviction for unlawful intercourse with a minor did

22  not violate any right clearly established by federal law nor did its admission result in prejudice

23  under the circumstances of this case.  Accordingly, petitioner is not entitled to federal habeas

24  relief on this due process claim.

25       **B.  Ineffective Assistance of Counsel**

26       In his second ground for relief, petitioner claims that his trial counsel rendered ineffective

27  assistance in failing to object to the admission of evidence that he displayed a knife to Victoria

28  /////

15

1   during an argument.  He argues that the admission of this evidence was "highly prejudicial" and

2   violated his right to a fair trial.  ECF No. 1 at 8.

3          The California Court of Appeal denied this claim, reasoning as follows:

> Defendant next contends defense counsel was ineffective in failing
> to object to testimony regarding an uncharged act.  He claims his
> trial counsel should have objected to Victoria's testimony regarding
> defendant's display of a knife.
>
> To establish ineffective assistance of counsel, a defendant must
> show (1) counsel's performance was below an objective standard of
> reasonableness under prevailing professional norms, and (2) the
> deficient performance prejudiced defendant.  (*Strickland v.
> Washington* (1984) 466 U.S. 668, 688, 691–692 [80 L.Ed.2d 674,
> 694, 696] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171,
> 216–217 (*Ledesma*).)  "'Surmounting *Strickland*'s high bar is never
> an easy task.' [Citation.]" (*Harrington v. Richter* (2011) 562 U.S.
> ——, —— [178 L.Ed.2d 624, 642] (*Richter*).)  "In order to prevail
> on [an ineffective assistance of counsel] claim on direct appeal, the
> record must affirmatively disclose the lack of a rational tactical
> purpose for the challenged act or omission." (*People v. Ray* (1996)
> 13 Cal.4th 313, 349.)  There is "a 'strong presumption' that
> counsel's representation was within the 'wide range' of reasonable
> professional assistance. [Citation.]" (*Richter, supra*, 562 U.S. —
> [178 L.Ed.2d at p. 642].)  The defendant must demonstrate that
> counsel made errors so serious that he or she was not functioning at
> the level guaranteed the defendant by the Sixth Amendment.  (*Ibid.*)
>
> Even if the challenged evidence was inadmissible, we cannot say
> that counsel's failure to object reflected substandard performance
> depriving defendant of a fair trial.  "Whether to object to
> inadmissible evidence is a tactical decision; because trial counsel's
> tactical decisions are accorded substantial deference [citations],
> failure to object seldom establishes counsel's incompetence."
> (*People v. Hayes* (1990) 52 Cal.3d 577, 621.)  This case is no
> exception.  As the People suggest, trial counsel may have decided
> not to object to Victoria's testimony about defendant's knife because
> an objection would have unnecessarily highlighted the testimony
> and made it seem more significant.  (*People v. Williams* (1997) 16
> Cal.4th 153, 215.)  This is especially true here, given that Victoria
> did not appear to feel threatened by defendant and easily took the
> knife away from him.
>
> In any event, defendant has not met his burden of establishing that
> defense counsel's failure to object prejudiced the outcome.  To
> show prejudice, "[i]t is not enough 'to show that the errors had
> some conceivable effect on the outcome of the proceeding.'"
> (*Richter, supra*, 562 U.S. at p. —— [178 L.Ed.2d at p. 642].)
> Defendant must show a reasonable probability that he would have
> received a more favorable result had counsel's performance not
> been deficient.  (*Strickland, supra*, 466 U.S. at pp. 693–694 [80
> L.Ed.2d at pp. 697–698]; *Ledesma, supra*, 43 Cal.3d at pp. 217–
> 218.)  "A reasonable probability is a probability sufficient to

1

2

> undermine confidence in the outcome." (*Strickland, supra*, 466
> U.S. at p. 694 [80 L.Ed.2d at p. 698].)

3

> Here, both victims positively identified defendant as their assailant.
> Their testimony was supported by other witnesses, text messages,
> forensic evidence and T.W.'s significant injuries. It simply is not
> reasonably probable the jury would have reached a more favorable
> verdict had defense counsel objected and the evidence been
> excluded.

4

5

6

*Estes*, 2013 WL 4477449, at ** 6-7.

7

The applicable legal standards for a claim of ineffective assistance of counsel are set forth

8

in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a *Strickland* claim, a defendant

9

must show that (1) his counsel's performance was deficient and that (2) the "deficient

10

performance prejudiced the defense." *Id.* at 687. Counsel is constitutionally deficient if his or

11

her representation "fell below an objective standard of reasonableness" such that it was outside

12

"the range of competence demanded of attorneys in criminal cases." *Id.* at 687–88 (internal

13

quotation marks omitted). Counsel's errors must be "so serious as to deprive the defendant of a

14

fair trial, a trial whose result is reliable." *Id.* at 87).

15

A reviewing court is required to make every effort "to eliminate the distorting effects of

16

hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

17

conduct from counsel's perspective at the time." *Id.* at 669; *see Richter*, 562 U.S. at 106.

18

Reviewing courts must also "indulge a strong presumption that counsel's conduct falls within the

19

wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. This presumption

20

of reasonableness means that the court must "give the attorneys the benefit of the doubt," and

21

must also "affirmatively entertain the range of possible reasons [defense] counsel may have had

22

for proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (internal quotation

23

marks and alterations omitted).

24

Prejudice is found where "there is a reasonable probability that, but for counsel's

25

unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466

26

U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the

27

outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable."

28

*Richter*, 562 U.S. at 111. A reviewing court "need not first determine whether counsel's

1    performance was deficient before examining the prejudice suffered by the defendant as a result of

2    the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of

3    lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697.

4         The California Court of Appeal's conclusion that petitioner failed to establish prejudice

5    with respect to this claim is not objectively unreasonable and should not be set aside.  Given the

6    extensive evidence that petitioner committed the charged crimes, there is no reasonable

7    probability that the result of the proceeding would have been different if petitioner's trial counsel

8    had successfully objected to the admission of evidence that he briefly displayed a knife during his

9    interaction with Victoria, which she took out of his hands and threw away.  Because petitioner

10   has failed to demonstrate prejudice, he is not entitled to relief on this claim.

11        **C.  Denial of Severance Motion**

12        In his third ground for relief, petitioner claims that the trial court's refusal to conduct

13   separate trials on the charges involving T.W. and B.L. violated his right to due process.  ECF No.

14   1 at 10.  He argues that the evidence supporting each charge was not cross-admissible and that the

15   charges involving T.W. were "far more prejudicial and inflammatory than the [B.L.] charges

16   because [T.W.] suffered serious facial injuries and [T.W.] described being knocked unconscious

17   and then raped."  *Id.*  Petitioner also argues that conducting a trial on the counts against both

18   victims together "paint[ed] a picture of petitioner as a serial sexual predator."  *Id.* at 14.  Finally,

19   petitioner contends that Cal. Penal Code § 1108, which allows the admission into evidence of

20   other-crimes evidence to demonstrate a criminal defendant's propensity to commit a similar

21   crime, is unconstitutional.  *Id.* at 11-12.

22        The California Court of Appeal rejected these arguments, reasoning as follows:

23             Defendant claims the trial court erred in denying his motion to
              sever trial of the counts involving different victims (T.W. and B.L.).
24             He contends reversal is warranted because the error is of
              constitutional magnitude and is not harmless beyond a reasonable
25             doubt.

26             Penal Code section 954 provides that "[a]n accusatory pleading
              may charge two or more different offenses connected together in
27             their commission, or different statements of the same offense or two
              or more different offenses of the same class of crimes or offenses,
28             under separate counts, and if two or more accusatory pleadings are

18

filed in such cases in the same court, the court may order them to be consolidated."   The count charging rape of T.W. and the count charging lewd and lascivious conduct of B.L. involved the same class of crimes for purposes of Penal Code section 954 and were properly joined in the accusatory pleading.   (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1112–1113.)

Where, as here, the statutory requirements for joinder are met, severance can be predicated only on a clear showing of prejudice. "'[I]n the context of properly joined offenses, "a party seeking severance must make a stronger showing of potential prejudice than would be necessary to exclude other-crimes evidence in a severed trial."' [Citations.]"   (*People v. Soper* (2009) 45 Cal.4th 759, 774 (*Soper*).)

Moreover, "the method utilized to analyze prejudice is itself significantly different from that employed in reviewing a trial court's decision to admit evidence of uncharged misconduct . . . . [A]mong the 'countervailing considerations' present in the context of severance - but absent in the context of admitting evidence of uncharged offenses at a separate trial - are the benefits to the state, in the form of conservation of judicial resources and public funds. [Citation.] . . .  [T]hese considerations often weigh strongly against severance of properly joined charges." (*Soper, supra*, 45 Cal.4th at p. 774.)   The first consideration in reviewing the trial court's decision to consolidate cases is whether the evidence in each case would have been cross-admissible in hypothetical separate trials.  If so, "that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify" joinder of the charges.  (*Id.* at p. 775.) We review the trial court's decision on a motion for severance of counts for abuse of discretion, in light of the information available to the trial court at the time the ruling was made. (*People v. Ochoa* (1998) 19 Cal.4th 353, 408, 409.)

Defendant relies on his earlier argument that section 1108 is unconstitutional, and maintains that the evidence against the different victims would not otherwise have been cross-admissible under section 1101 to show such things as identity, modus operandi, or sexual proclivities.   But, as previously discussed, section 1108 is not unconstitutional.  Therefore, the sexual offenses would have been cross-admissible unless exclusion was mandated under section 352.  (*Falsetta, supra*, 21 Cal.4th at pp. 916–917.) The problem of confusing the jury with collateral matters would not arise.  (*People v. Bean* (1988) 46 Cal.3d 919, 938–939.)  Nor would it have created an undue consumption of time.   Neither sexual offense was more inflammatory than the other.   Although one involved violence, the other involved molesting a child, and both crimes displayed predatory behavior.  Because the evidence would have been cross-admissible, any inference of prejudice has been dispelled.  (*Soper, supra*, 45 Cal.4th at p. 775.)

Defendant cites *Bean v. Calderon* (9th Cir. 1998) 163 F.3d 1073, in which the Ninth Circuit Court of Appeals found erroneous the joinder of two murder charges.  The evidence on one murder charge was much stronger and was not cross-admissible, but the jury had

1     been led to believe otherwise by the prosecutor's closing argument
      and jury instructions, tainting the jury's verdict.  (*Id.* at pp. 1075–
2     1076, 1083–1085.)  Here, however, the evidence in both cases was
      strong.   And unlike *Bean*, where the court was concerned that
3     evidence of a non-cross-admissible prior murder led the jury to
      infer criminal propensity, the Legislature has expressly authorized
4     that evidence of sexual misconduct with another victim may be
      used to create an inference of criminal propensity under section
5     1108.  Because defendant's trial was not prejudiced by joinder, no
      fundamental unfairness resulted.
6
      Even though the trial court did not abuse its discretion in denying
7     the severance motion, "'we look to the evidence actually introduced
      at trial to determine whether "a gross unfairness has occurred [from
8     the joinder] such as to deprive the defendant of a fair trial or due
      process of law.'"  [Citations.]"  (*People v. Thomas* (2012) 53
9     Cal.4th 771, 800–801.)   In this case, there is no evidence that
      defendant expressed a desire to testify in one case but not the other,
10    and no evidence that the trial court's refusal to sever the counts
      quashed such a desire.  The record does not show any indication of
11    improper reliance on the evidence supporting the counts involving
      T.W. for conviction of the counts involving B.L., or vice versa.
12    The evidence in both cases was strong, both victims positively
      identified defendant as the perpetrator, and both were supported by
13    corroborating evidence.  Defendant has not demonstrated that any
      actual prejudice from an alleged spill-over effect of such counts
14    actually resulted from the joinder of the charges for trial.  (*People v.
      Bradford* (1997) 15 Cal.4th 1229, 1318.)  Defendant fails to show
15    that denial of severance deprived him of a fair trial.  (*People v.
      Thomas, supra*, 53 Cal.4th at p. 801.)
16
17    *Estes*, 2013 WL 4477449, at **7-8.

18        The United States Supreme Court has explained, with regard to federal defendants, that

19    "[i]mproper joinder does not, in itself, violate the Constitution."  *United States v. Lane*, 474 U.S.

20    438, 446 n.8 (1986).  Rather, habeas relief on a claim of improper joinder is appropriate only

21    where the "simultaneous trial of more than one offense . . . actually render[ed] petitioner's state

22    trial fundamentally unfair and hence, violative of due process."  *Sandoval v. Calderon*, 241 F.3d

23    765, 771-72 (9th Cir. 2000) (quoting *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir.

24    1991)).  *See also Lane*, 474 U.S. at 446, n.8 (1986) ("misjoinder would rise to the level of a

25    constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth

26    Amendment right to a fair trial"); *Davis v. Woodford*, 384 F.3d 628, 638-39 (9th Cir. 2004); *Park

27    v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).  Severance should be granted "only if there is

28    a serious risk that a joint trial would compromise a specific trial right of a properly joined

20

1    defendant or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*

2    *v. United States*, 506 U.S. 534, 539 (1993).  "[I]t is well settled that defendants are not entitled to

3    severance merely because they may have a better chance of acquittal in separate trials." *Collins*

4    *v. Runnels*, 603 F.3d 1127, 1132 (9th Cir. 2010).

5           With regard to habeas corpus actions in federal court, however, the Court of Appeals for

6    the Ninth Circuit has held that:

7                  the statement in *Lane* regarding when misjoinder rises to the level
                   of constitutional violation was dicta and . . . *Zafiro* is not binding on
8                  the state courts because it addresses the Federal Rules of Criminal
                   Procedure.   (Citation omitted.)    Neither decision is 'clearly
9                  established Federal law' sufficient to support a habeas challenge
                   under § 2254.
10

11   *Runningeagle v. Ryan*, 686 F.3d 758, 776 (9th Cir. 2012).  *See also Collins*, 603 F.3d at 1131 (the

12   decisions in *Zafiro* and *Lane* do not "establish a constitutional standard binding on the states

13   . . .").[5]  In light of these authorities, petitioner has not demonstrated that the California Court of

14   Appeal's denial of this claim for relief violated clearly established United States Supreme Court

15   authority.

16          Further, even if the standards set forth in *Lane* and *Zafiro* were applicable here, petitioner

17   would still not be entitled to federal habeas relief because he has failed to demonstrate that

18   joinder of all of the charges against him "actually render[ed][his] state trial fundamentally

19   unfair." *Featherstone*, 948 F.2d at 1502.  As explained by the California Court of Appeal, the

20   evidence with regard to all of the charges against petitioner was cross-admissible under state law

21   to show identity, modus operandi, and/or sexual proclivities.  None of the crimes involved

22   complicated scenarios, confusing scientific evidence or complex transactions.  Further, the

23   evidence supporting petitioner's conviction for his crimes against both victims was substantial.

24          In any event, any possible prejudice was limited through appropriate jury instructions.

25   *See Lane*, 474 U.S. at 450 n.13 (concluding, in a case regarding misjoinder of defendants, that a

26

27          [5]   Although *Collins* ultimately limited its holding to "cases where defendants present
     mutually antagonistic defenses," *Collins*, 603 F.3d at 1132–33, its reasoning regarding *Zafiro* and
28   *Lane* applies equally here.

"carefully crafted limiting instruction" may reduce prejudice "to the minimum" and that"[w]e cannot necessarily assume that the jury misunderstood or disobeyed such instructions" (internal citations and quotation marks omitted)). Petitioner's jury was instructed that: (1) "in deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial (RT at 215); (2) "the People must still prove each charge beyond a reasonable doubt" (*id.* at 237); and (3) that the People had the burden to prove each allegation beyond a reasonable doubt (*id.* at 239-41). Although the jury instructions did not specifically inform the jury that they could not consider evidence of one offense as evidence establishing the other offense, the jury was instructed that "each of the counts charged in this case is a separate crime" and they must "consider each count separately and return a separate verdict for each one" (*id.* at 247). The jury returned separate verdicts for all of the charges, using separate verdict forms. CT at 271-78. There is no evidence that the jury was confused or was unable to consider separately the evidence which pertained to each charged crime.

Under these circumstances, consolidation of the charges involving both victims for trial did not have a substantial and injurious effect or influence in determining the jury's verdict. The opinion of the California Court of Appeal to the same effect is not contrary to or an unreasonable application of federal law. Accordingly, petitioner is not entitled to relief on this claim.

### D. Cumulative Error

In his fourth ground for relief, petitioner claims that the cumulative effect of errors at his trial violated his right to due process. ECF No. 1 at 15. The California Court of Appeal rejected this claim, reasoning as follows:

> Defendant contends the cumulative error requires reversal. "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844–845.) This is not such a case. "[N]o serious errors occurred that, whether viewed individually or in combination, could possibly have affected the jury's verdict." (*People v. Martinez* (2003) 31 Cal.4th 673, 704; *People v. Valdez* (2004) 32 Cal.4th 73, 128.)

*Estes*, 2013 WL 4477449, at *8.

1    The cumulative error doctrine in habeas recognizes that, "even if no single error were

2    prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless

3    be so prejudicial as to require reversal.'" *Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002)

4    (quoting *United States v. de Cruz*, 82 F.3d 856, 868 (9th Cir. 1996)).  However, where there is no

5    single constitutional error existing, nothing can accumulate to the level of a constitutional

6    violation.  *See Fairbank v. Ayers*, 650 F.3d 1243, 1257 (9th Cir. 2011) ("[B]ecause we hold that

7    none of Fairbank's claims rise to the level of constitutional error, 'there is nothing to accumulate

8    to a level of a constitutional violation.'") (citation omitted); *Hayes v. Ayers*, 632 F.3d 500, 524

9    (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no

10   cumulative prejudice is possible.").  "The fundamental question in determining whether the

11   combined effect of trial errors violated a defendant's due process rights is whether the errors

12   rendered the criminal defense 'far less persuasive,' *Chambers v. Mississippi*, 410 U.S. 284, 294

13   (1973), and thereby had a 'substantial and injurious effect or influence' on the jury's verdict."

14   *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (quoting *Brecht*, 507 U.S. at 637).

15   This court has addressed petitioner's claims of error and has concluded that no error of

16   constitutional magnitude occurred.  There is also no evidence that an accumulation of errors

17   rendered petitioner's trial fundamentally unfair.  Accordingly, petitioner is not entitled to relief on

18   his claim that cumulative error violated his right to due process.

19   **IV. Conclusion**

20   Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

21   habeas corpus be denied.

22   These findings and recommendations are submitted to the United States District Judge

23   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

24   after being served with these findings and recommendations, any party may file written

25   objections with the court and serve a copy on all parties.  Such a document should be captioned

26   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

27   shall be served and filed within fourteen days after service of the objections.  Failure to file

28   objections within the specified time may waive the right to appeal the District Court's order.

*Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  *See* Rule 11, Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  December 13, 2016.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE